UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Derivatively on Behalf of FIBROGEN, INC., | ) ) ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ENRIQUE CONTERNO, JAMES SCHOENECK, K. PEONY YU, MARK EISNER, and PAT COTRONEO, | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| – and – | ) | |
| | ) | |
| FIBROGEN, INC., a Delaware corporation, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, UNJUST ENRICHMENT, CORPORATE WASTE,
CONTRIBUTION AND INDEMNIFICATION

FARNAN LLP
BRIAN E. FARNAN
MICHAEL J. FARNAN
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302/777-0300

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

**DATE: JUNE 30, 2023**

## INTRODUCTION

1.     This is a shareholder derivative action on behalf of nominal defendant FibroGen, Inc. ("FibroGen" or the "Company") for breach of fiduciary duty, unjust enrichment, contribution, and indemnification against Enrique Conterno ("Conterno"), James Schoeneck ("Schoeneck"), K. Peony Yu ("Yu"), Mark Eisner ("Eisner"), and Pat Cotroneo ("Cotroneo") (together "defendants").  Defendants, at all relevant times, served as senior executives of FibroGen.

2.     FibroGen is a biopharmaceutical company based in San Francisco, California. Between December 2018 and July 2021, defendants falsely represented:  (i) Roxadustat's efficacy and safety profile; (ii) if Roxadustat would receive a "Black Box" severe safety warning label if approved; (iii) the non-infringement margin FibroGen used in its safety analysis of Roxadustat; and (iv) the likelihood of FDA approval of Roxadustat.

3.     These statements were false when made and propelled by the Company's common stock price to $59.91 per share on March 1, 2019, up over 41% from $42.43 per share on December 20, 2018.  While FibroGen's common stock price was artificially inflated, defendants sold $9 million worth of their personal FibroGen shares.  They also obtained approval of an executive package that increased their personal compensation to over $36.7 million, in 2020-2021 alone.

4.     In fact, the Roxadustat safety data had been altered.  Defendants made statistically significant "post hoc changes" to multiple clinical trial analyses after the data had been un-blinded.  Once the post hoc manipulations were corrected, the true data revealed that Roxadustat posed substantial safety concerns, including thrombosis, seizures, stroke, and even death, that effectively doomed its FDA approval prospects.

5.     When the truth finally emerged, FibroGen's common stock price collapsed. On July 15, 2021, the FDA's Advisory Committee ("AdCom") voted against approval of Roxadustat for any patient population.  The FDA rested the rejection significantly on FibroGen's own undisclosed data that showed that Roxadustat's efficacy over an alternative was inconclusive at best and caused greater rates of some important adverse events.  Before the FDA's July 15, 2021 meeting, and as early as April 6, 2021, concerns arose that FibroGen had engaged in after-the-fact "data-dredging" to alleviate safety concerns – including increased risk of thrombosis, seizures, stroke, and even death – around Roxadustat. "Data-dredging" is a type of practice done after-the-fact to obtain a positive result from a failed study.  On this news, the price of FibroGen common stock plummeted by $10.49 per share, or 42%, to $14.35 per share on July 16, 2021.

6.     Due to defendants' misrepresentations and material omissions, FibroGen shareholders sued the Company and others for violations of the federal securities laws in an expensive and costly-to-defend class action lawsuit.  *See In re FibroGen, Inc. Secs. Litig.*, No. 3:21-cv-2623-EMC (N.D. Cal.) (the "Securities Action").

7.     On July 15, 2022, the United States District Court for the Northern District of California, the Honorable Edward M. Chen presiding, sustained the shareholder plaintiffs' claims for violations of §§10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") against the Company, notwithstanding the materially heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The Court found that, because Roxadustat's viability was so critical to FibroGen's business, "it would be 'absurd' to suggest that management did not know about the issues with their flagship product that jeopardized FDA approval and such allegedly blatant manipulation and misrepresentation in order to save it." *In re FibroGen, Inc. Sec. Litig.*, 2022 WL 2793032, at

*30 (N.D. Cal. July 15, 2022) (quotations omitted).  The Court also concluded that "[d]efendants' compensation structure suggests some degree of scienter" as well.  *Id.* at *28.

8.      By misleading FibroGen's shareholders and self-dealing, defendants breached their fiduciary duty to avoid self-dealing and the dissemination of false company information and unjustly enriched themselves at FibroGen's expense.  Nevertheless, FibroGen's Board of Directors (the "Board"), has not, and will not, take legal action against defendants.  This fact is borne out by the FibroGen Board's decision to effectively ignore plaintiff's litigation demand.

9.      On July 29, 2022, plaintiff made a written demand (the "Demand") on FibroGen's Board to sue defendants for damages.  Damages claims including for breach of fiduciary duty are corporate assets, and like all corporate assets their value must be preserved and always protected by a board of directors.  Accordingly, plaintiff demanded that the Board forthwith file a complaint against defendants for breach of fiduciary duty, as well as seek contribution against defendants for losses arising from their false statements to FibroGen shareholders.  But rather than act, the Board ignored the Demand.  As a result, for over six months, plaintiff's calls on the Board to seek redress for FibroGen remain unanswered.

10.     However, in the face of a litigation demand, a board of directors cannot stand neutral but rather must affirmatively object to or support the litigation.  A board must investigate and make an informed judgement whether the demanded action is in the best interest of the corporation.  Although it is essential that a board of directors' process be meaningful, so that it inspires confidence, the process cannot drag on forever, or, worse, be deferred indefinitely and halted before it starts.  Where a board takes no action and simply fails to address a demand, a shareholder may proceed with its lawsuit.  And, in such

situations, courts may conclude that shareholders need wait no longer.  Simply put, a board of directors cannot, consistent with its fiduciary duty, brush-off a demand or indefinitely defer it.  Both strategies are effectively the same:  a rejection of the demand that is not shielded from judicial scrutiny by the business judgment rule.

11.     Here, contrary to its duty, FibroGen's Board has wrongfully rejected plaintiff's Demand.  Rather than timely act on the Demand, the Board has left the Demand in limbo, with no progress, for over six months.  Despite ample opportunity, the Board has not ordered FibroGen to sue defendants.  Nor has the Board directed FibroGen to assert crossclaims against defendants for contribution or any other relief in the Securities Action.  Driven by disdain for the Demand, the Board has abdicated it fiduciary duty such that plaintiff may proceed derivatively on behalf of FibroGen against defendants in this lawsuit.

12.     The Board's attempt to defer action on the Demand fares no better, as this strategy is effectively a rejection of the Demand as well.  Moreover, the deferral is another form of neutrality that warrants no deference under the business judgment rule.  The Board's decision to defer investigation or consideration of the Demand was not done in an informed manner and with due care.  Indeed, the Board's short one-page letter, dated November 11, 2022, informing plaintiff of the deferral, on its face does not demonstrate that the Board weighed any potential recovery from the derivative action or considered the merits of breach of fiduciary duty or other claims.

13.     Nor can the Board fall back on the pendency of the Securities Action to justify brushing off the Demand.  If the mere existence of a pending class action lawsuit was enough to outweigh all other factors, then a corporation's right of action against wayward officers would be seriously compromised.  Accordingly, the Board has wrongfully refused

- 4 -

the Demand and plaintiff may proceed derivatively on behalf of FibroGen against defendants in this lawsuit.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 because plaintiff's claims raise a federal question under §10(b) of the Exchange Act 15 U.S.C. §78j(b), and §21D of the Exchange Act, 15 U.S.C. §78u-4(f).  The Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a).

15.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in under 28 U.S.C. §1391 because: (a) FibroGen maintains its principal executive offices in this District; (b) one or more of the defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein took place in this District; and (d) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

17.    Plaintiff The Firemen's Retirement System of St. Louis ("St. Louis") is, and continuously has been, a FibroGen shareholder since 2018.  Plaintiff will adequately represent FibroGen's interests in the derivative claims asserted in the action.

18.    Nominal Defendant FibroGen is incorporated in Delaware and maintains its principal executive offices at 409 Illinois Street, San Francisco, California 94158.  The

Company's shares are listed on the NASDAQ stock exchange ("NASDAQ") under the ticker symbol "FGEN."

19.     Defendant Conterno has been the Company's Chief Executive Officer ("CEO") since January 2020.  Conterno has received over $22 million in compensation since becoming the Company's CEO.

20.     Defendant Schoeneck was the Company's interim CEO from August 26, 2019, until defendant Conterno became the Company's CEO at the start of 2020.  Schoneck received almost $6 million in compensation during his tenure as the Company's CEO.

21.     Defendant Yu is the Company's former Chief Medical Officer ("CMO") Yu abruptly resigned as the Company's CMO on November 27, 2020, and became an "Executive Advisor" to the CEO, defendant Conterno, on December 21, 2020.  Yu received over $9 million in compensation from 2019 to 2020.

22.     Defendant Eisner is the Company's current CMO and has been since December 1, 2020.  Eisner has received nearly $8 million in compensation since becoming the Company's CMO.

23.     Defendant Cotroneo was at all relevant times the Company's Chief Financial Officer ("CFO").  Cotroneo has received about $11 million in compensation since 2019.

## DEFENDANTS' FIDUCIARY DUTIES

24.     In *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."  The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to

fulfill their duty of care)." *Hampshire Grp., Ltd. v. Kuttner*, 2010 WL 2739995, at *11 (Del. Ch. July 12, 2010). Like directors, corporate officers owe the corporation a fiduciary duty of oversight. *In re McDonald's Corp. S'holder Deriv. Litig.*, 2023 WL 387292, at *1, *9 (Del. Ch. Jan. 26, 2023).

25.    Moreover, "[u]nlike directors, corporate officers cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7), which permits a corporation to offer such protection to directors in a corporate charter." *Hampshire Grp.*, 2010 WL 2739995, at *13; *Chen v. Howard-Anderson*, 87 A.3d 648, 686-87 (Del. Ch. 2014) (holding "the Exculpatory Provision [under §102(b)(7)] does not protect [the CEO] when acting in his officer capacity").

26.    Instead, under Delaware law, corporate officers "face a statutory exposure to liability that is often greater than directors." *Hampshire Grp.*, 2010 WL 2739995, at *13; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780-81 (Del. Ch. 2016) (holding that officers owe fiduciary duties identical to those of directors, but adding that officers are also "agents who report to the board of directors" and "have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles").

27.    Here defendants Conterno, Schoeneck, Yu, Eisner, and Cotroneo served as officers of FibroGen. Therefore, defendants "cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7)," but rather "can be held liable in damages to [FibroGen] if they acted with gross negligence and caused injury to the corporation." *Hampshire Grp.*, 2010 WL 2739995, at *13. As detailed below, it is clear that defendants, and each of them, breached their fiduciary duties of loyalty and care to FibroGen by making materially false and misleading statements about, Roxadustat, the Company's flagship drug, and further breached

their fiduciary duty of loyalty by selling nearly $9 million worth of FibroGen shares at artificially inflated prices while they, but not the market, were aware of non-public adverse information, and engineering false statements about the successful development of Roxadustat to secure extra compensation exceeding $36.7 million for themselves tied to regulatory and commercial milestones for Roxadustat.

28.    Additionally, defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to FibroGen shareholders, or the market generally, about the business of the corporation. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("'Corporate fiduciaries can breach their duty of disclosure under Delaware law ... by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.'") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures. The law of partial disclosure is likewise clear: 'Once defendants travel[] down the road of partial disclosure ... they ... [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

29.    As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 2007 WL 2351071 (Del. Ch. Aug. 15, 2007), "[w]hen ... directors communicate with shareholders, they also must do so with ***complete candor***":

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

*Id.* at \*3-\*4. These strict disclosure obligations apply to defendants, as officers of a Delaware corporation, with equal force. *Gantler*, 965 A.2d at 709; *Hampshire Grp.*, 2010 WL 2739995, at \*10-\*11.

30. Moreover, it is settled Delaware law that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). Where corporate officers and directors: (a) are in possession of material, non-public company information; and (b) use that information in making stock sales which are motivated, in whole or in part, by the substance of that information, they have breached their non-exculpable fiduciary duty of loyalty. *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31. In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

32. During all relevant times, defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they were. In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

33.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise defendants' violations of law, including breaches of fiduciary duties, corporate waste, and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

34.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release improper statements purposefully, recklessly, or negligently.  Because the actions described herein occurred under the authority of the Board, each of the defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

35.     Each of the defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and in furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### FibroGen and Its Flagship Drug, Roxadustat

36.     Based in the San Francisco Bay Area, FibroGen is a biopharmaceutical company.  The Company's flagship drug is Roxadustat, an experimental pill for treating anemia in patients with chronic kidney disease ("CKD").  Currently, a drug known as Epogen is the standard treatment for CKD patients with anemia.  But Epogen is only available for patients already dependent on dialysis ("DD patients") because it can lead to an increased risk of major adverse cardiac events ("MACE").

37.     FibroGen required the approval of the FDA to market and sell Roxadustat in the United States.  Consequently, the Company had to demonstrate through Phase 3 clinical trials that Roxadustat was at least as effective as Epogen but without the safety issue that precluded Epogen from being used to treat dialysis dependent and non-dialysis dependent patients.

38.     In fact, Roxadustat was neither superior to Epogen nor safer than the placebo, rendering it difficult for FibroGen to obtain critical FDA approval of Roxadustat. Defendants did not timely disclose these adverse, material non-public facts.  Instead, between December 2018 and July 2021, defendants embarked on a public relations campaign designed to artificially inflate the trading price of FibroGen common stock that enabled them to secure personal financial benefits for themselves.  In response, FibroGen's common stock price rose to $59.91 per share on March 1, 2019, up over 41% from $42.43 per share on December 20, 2018.  In addition to selling FibroGen stock for over $9 million in illicit insider trading proceeds, defendants also pocketed over $36.7 million in incentive compensation, consisting of bonuses and stock options awards tied to FibroGen meeting certain regulatory and commercial milestones for Roxadustat.

39.     To advance their unlawful stock scheme, defendants misrepresented in shareholder communications, including in press releases, public filings and during shareholder and investor events, that Roxadustat's Phase 3 trial results demonstrated that it was superior to Epogen and safer than the placebo, which made FDA approval of Roxadustat appear likely.  Defendants misrepresented four key facts:  (i) Roxadustat's efficacy and safety profile; (ii) if Roxadustat would receive a "Black Box" severe safety warning label if approved; (iii) the non-infringement margin FibroGen used in its safety analysis of Roxadustat; and (iv) the likelihood of FDA approval of Roxadustat.

- 11 -

### Defendants' False and Misleading Statements
### About Roxadustat and Its Potential

40.     For example, on December 20, 2018, FibroGen announced "Positive Topline Results from Three Global Phase 3 Trials of Roxadustat." In the press release, discussing the efficacy of Roxadustat, defendant Yu, FibroGen's CMO, stated:

> *We are excited to have achieved superiority in efficacy not only against placebo but also over epoetin alfa in our studies* .... These results support [R]oxadustat's potential to bring clinical benefit over current standard of care, such as reducing blood transfusion risk in patients on dialysis and those not on dialysis, and to improve patient access to anemia therapy with a new convenient oral therapeutic.

41.     A few weeks later, on February 27, 2019, in a press release announcing FibroGen's 4Q18 and FY2018 results, defendant Yu, again discussing the efficacy of Roxadustat, stated:

> First of all, *these Phase III studies demonstrated roxadustat's efficacy*. We met the primary efficacy end point in each of the 3 CKD non-dialysis studies, ANDES by FibroGen, OLYMPUS by AstraZeneca and ALPS by Astellas, by demonstrating superiority of roxadustat compared to placebo in the change in hemoglobin level from baseline, the hemoglobin averaged over weeks 28 to 52. In the Phase III dialysis studies, noninferiority criteria were met in primary end point comparing hemoglobin change in roxadustat- treated patients with those on EPO alfa, which is the current standard of care in dialysis and in CKD patients. And furthermore, *superiority [to Epogen] was demonstrated in all 3 dialysis studies*.
>
>        *     *     *
>
> Also, *much clinical importance*, roxadustat-treated patients had significant reduction in red blood cell transfusion risk, which was measured by time to first transfusion when compared to placebo in CKD non- dialysis studies. Moreover, in active control trial in SIERRAS study, our U.S. dialysis conversion study in which patients were randomized to receive *Roxadustat or to continue stable maintenance dose of epoetin alfa, roxadustat was also shown to have a lower transfusion risk than ESA*. Other than the usual risks ... red blood cell transfusion is known to reduce CKD patients' eligibility for kidney transplant ... Kidney transplant is the preferred option for patients with end-stage kidney disease because of longer survival than chronic dialysis. This is why transfusion reduction is such a *big deal* and could be of great *significance to CKD patients*.

- 12

42.     Defendant Yu continued:

Turning to preliminary safety data.  ***Results in individual studies are consistent with what one would expect in the study patient population***.  The integrated full safety analyses are ongoing.  The adjudicated MACE results are on track for the first half of 2019.  ***Encouraged by the robust efficacy results, the preliminary safety data in individual Phase 3 studies and the ongoing pool efficacy and safety analyses***, we are working diligently with our partners, AstraZeneca in the preparation of NDA submission in the U.S. and with Astellas in the preparation for the MAA in Europe.

43.     In early May 2019, FibroGen announced "Positive Topline Results From Pooled Safety Analyses of Roxadustat Global Phase 3 Program."  In the May 9, 2019 press release, discussing the safety analysis of Roxadustat, defendant Yu stated:

***We are particularly excited about the results indicating a reduction of risk of MACE+ events in incident dialysis patients***, and the additional potential clinical benefits of [R]oxadustat beyond anemia correction, to include attenuation of renal function decline and improvement of quality of life in NDD- CKD patients....  Further analyses of overall safety is ongoing and will inform on the overall benefit risk.

44.     Defendant Yu, commenting on the efficacy of Roxadustat, continued:

We are particularly excited about the results indicating a reduction of risk of MACE+ events in incident dialysis patients, and the additional potential clinical benefits of Roxadustat beyond anemia correction, to include attenuation of renal function decline and ***improvement of quality of life in NDD- CKD patients***.  As we accumulate a body of evidence of roxadustat efficacy and safety with these adjudicated pooled analyses, we look forward to begin discussions with U.S. FDA on NDA submission....  In the pooled analyses from the three NDD studies, we observed statistically ***significant improvements*** from baseline to Week 12 in quality of life endpoints, including SF-36 Vitality subscale($p=0.0002$), SF-36 Physical Functioning subscale ($p=0.0369$), FACT-AN Anemia subscale($p=0.0012$), FACT-AN Total score ($p=0.0056$), and EQ-5D-SL VAS score ($p=0.0005$) when comparing roxadustat to placebo in CKD patients not on dialysis.

45.     On the same date, May 9, 2019, defendant Yu participated in a conference call for FibroGen shareholders and securities analysts.  During the call, in an exchange with a securities analyst, defendant Yu, speaking to the efficacy of Roxadustat and the safety analyst of the drug, stated:

Analyst: "Okay. And then a question on the nondialysis MACE analyses. Did the event rate compare favorably to the comparator arm? And how – in that analysis, how does it take into consideration the differences in the dropout rate?"

Yu: "So we have – **because our drug is so efficacious and so well tolerated, patients really like staying on our drug**. And even we did see a high – a somewhat higher dropout rate in placebo-treated patients. However – and to have some anticipation this could happen, we have collected safety data on patients during the post-treatment period. And that's why we are able to conduct the ITT analysis. And this will be – of course, the final assessment in – and the statistics will be discussed with the FDA. And I just wanted to share that in the nondialysis population, [ITT] is – will be considered a relatively conservative analysis. And **the fact that** we had – **we are able to show non-inferiority to placebo under such conditions** really illustrates the strength of our drug's safety. And I wanted to also remind us that placebo is considered **the gold standard for safety**."

46.    In response to another question about the safety analysis of Roxadustat, defendant Yu responded:

Analyst: "Provide us **reassurance** that the **number of ... deaths, MIs, and STROKES** in the stable dialysis patients who were switched to Roxadustat, still favors Roxadustat. Because obviously, you don't have the same power or same apparent benefit in the pooled dialysis as you do in the incident."

Yu: "[W]hen we look at subgroup analysis of the – between incident dialysis versus the stable conversion dialysis, **we are quite comfortable with the safety result when looking at MACE and MACE+** ... even though I'm not giving you exact number of patients for each category, right, but I am willing to share with you that in the subgroup analysis, **when we tested time to – for example, MACE+ and MACE, Roxadustat was at least non-inferior to epoetin alfa even in the conversion stable dialysis patients** we're at this – we are still on the – releasing the top line results. The fine granular geographic subgroup analysis and more detailed analysis are – still needs to be conducted. But we'll plan to – between now and NDA submission, it will be completed before then."

47.    Responding to question about whether Roxadustat would have a Black Box warning and the safety analysis of drug in an exchange with a securities analysis, defendant Yu stated:

Analyst: "A couple of questions for me. First, based on this MACE data, how do we think of the label language if approved? Are we confident to avoid a black box?"

Yu: "[W]hat FDA puts on the label is something that they – that we may not have much control over, except that we have developed that we'll target a certain label. And so we – FDA has advised that the evaluation of efficacy, primary efficacy, will be based on individual studies, and we have checked that box. And the evaluation of safety is FDA may – will look at various aspects of safety. And ***based on what we have seen, we are pretty comfortable with safety. This adjudicated composite safety endpoint was something that we have discussed with the FDA*** .... But at the end, the assessment is - really depends on the medical reviewer at the FDA. And there will – if there were an Advisory Committee, then there would be input from the Advisory Committee if the FDA chooses to."

48.     As 2019 unfolded, defendants also caused FibroGen to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") reporting the Company's financial results and other material information, including the status of Phase 3 clinical trials of Roxadustat. For example, in the Company's 1Q19 Report on Form 10-Q, dated May 9, 2019, defendant Cotroneo, FibroGen's CFO, commenting on the safety analysis of Roxadustat, stated: "For the U.S., where the focus will be on MACE, based on the collective results of the various MACE analyses, we believe there is ***no clinically meaningful difference in MACE risks between roxadustat and epoetin alfa***." Continuing, he added: "In the MACE analysis of this same subgroup [incident dialysis], there was a trend toward ***reduced risk of MACE for patients on roxadustat, compared to epoetinalfa***." Defendant Cotroneo, as to the safety analysis of Roxadustat, further stated: "For the U.S., where the focus will be on MACE, based on the collective results of the various MACE analyses, we believe there is ***no clinically meaningful difference in MACE safety between roxadustat and placebo in this same non-dialysis population***."

- 15

49.    On June 12, 2019, FibroGen executives presented at the Goldman Sachs 40th Annual Global Healthcare Conference.  Addressing the safety analysis of Roxadustat and the efficacy of the drug, defendant Yu stated:

> So we've recently reported exciting positive full adjudicated cardiovascular safety results from the largest Phase III CKD anemia program.  We believe we have ***compelling evidence confirming [R]oxadustat's cardiovascular safety to support our regulatory filings***....  For U.S., we believe ***our MACE results in dialysis and in non- dialysis also support the conclusion of no increased cardiovascular safety risk***.  To further frame the safety result, along with efficacy together, in dialysis, I also want to emphasize ***[the] MACE+ superiority in [the] incident dialysis pool*** of over 1,500 patients.  Lower MACE+ risk than EPO in incident dialysis may allow Roxadustat to become first- line therapy for patients starting dialysis and continuing long-term anemia treatment.   Superiority in transfusions avoiding EPO hyporesponsiveness are important benefits too in this population.  For nondialysis, we believe safety noninferiority against placebo in MACE and MACE+ coupled with efficacy benefits like transfusion reduction, attenuation of renal progression, measuring eGFR change and improvement in quality of life when treating patients with roxa may give us the opportunity to improve and expand anemia care in the very large CKD nondialysis patient population.

50.    Two months later, on August 8, 2019, defendants participated in an earnings call for FibroGen shareholders and securities analysis.  During the call reporting about the Company's 2Q19 results, defendant Yu, commenting on the safety analysis of Roxadustat, stated:

> As stated by our US partner AstraZeneca, our ***Phase 3 results confirmed the cardiovascular safety of [R]oxadustat***.  Together with our partners, AstraZeneca and Astellas, we recently had a very good pre-NDA meeting with the FDA on roxadustat.  We reached an agreement with the FDA on our proposed pooled MACE analysis in dialysis and in nondialysis.  We are pleased with the agreement for nondialysis as it includes an approach to account for the differential dropout between roxadustat and placebo.  With agreement on NDA content and format, we are moving as quickly as we can for a submission.  We do have a large submission, at this time, we are targeting October of this year.

\*        \*        \*

So we are very pleased with the agreement *[with the FDA] on the primary safety analysis of our primary cardiovascular safety endpoint in NDD*.

51.    On August 8, 2019, FibroGen also filed its 2Q19 Report with the SEC. Therein, defendant Cotroneo, commenting on the efficacy and safety analysis of Roxadustat, stated:

> In our pre-NDA meeting with the FDA, we reached agreement on the content to be included in our NDA submission package for Roxadustat for treatment of anemia in CKD, including the cardiovascular safety analyses for both CKD-dialysis and CKD-non-dialysis. The agreement for non-dialysis is an approach to account for the differential dropout between roxadustat and placebo observed in our Phase 3 studies. We are confident we have sufficient data for FDA review of our NDA in both CKD dialysis and CKD non-dialysis and we are planning to submit the NDA in October of 2019.

52.    In late fall 2019, FibroGen announced addition Phase 3 Roxadustat clinical trial results. In a November 8, 2019 press release, for example, the Company announced "Positive Phase 3 Pooled Roxadustat Safety and Efficacy Results." The press release stated, in part, that (i) "*Roxadustat cardiovascular safety comparable to placebo in [NDD] patients* as assessed by [MACE] and MACE+"; (ii) "Roxadustat *did not increase risk of MACE and reduced risk of MACE+ compared to epoetin alfa in [DD] patients*"; and (iii) "*Roxadustat reduced risk of MACE by 30% and MACE+ by 34% compared to epoetin alfa* in the incident dialysis (ID) patient subgroup of the DD population."

53.    On November 11, 2019, FibroGen reported its results for 3Q19. On the same date, defendants Schoeneck, FibroGen's Interim CEO, and Yu participated in a conference call for shareholders and securities analysts. During the call, in an exchange with a securities analyst, defendant Schoeneck, speaking to the safety analysis of Roxadustat, stated:

> The pooled results show that roxadustat's *cardiovascular safety was comparable to placebo in [NDD] patients. And in [DD] patients, roxadustat did not increase the risk of MACE and reduce the risk of MACE+ compared to epotin alfa*, the leading product currently used to treat this population. Finally, in the subgroup of dialysis patients who recently

- 17 -

started dialysis, referred to as incident dialysis patients, roxadustat reduced MACE by 30% and MACE+ by 34% compared to epoetin alfa. Roxadustat achieved the primary hemoglobin efficacy endpoints in all of these groups.... Having an oral product with this safety and efficacy profile can offer patients with anemia or chronic kidney disease and their doctors a treatment unlike anything currently on the market in the U.S. or Europe.

54.     In an exchange with a securities analyst about the non-inferiority margin of Roxadustat, defendant Yu responded:

> Analyst: "When are you going to talk about the ... statistical analysis plan, including the non-inferiority margin. Is there any pre-planned FDA meeting in the coming weeks?"
>
> Yu: "So the answer to that question is that we had already talked with the FDA about [the] analytical plan, and we had made the agreement on the analysis plan. The results that we have presented in the high-impact clinical session at the ASN, and **the numbers I had just presented, were based on the agreed upon analysis plan that we have made with the FDA** ... So we are talking about the analysis plan, meaning how do you pool, what's the pooling strategy and the analysis plan, how to analyze the data. When you talk about NI margins, you're talking about the standard for assessment, right? And as I mentioned earlier that we expect that [all] regulators will assess the data based on the very – all the – on the entire application of the NDA. And based on our dialogue with the FDA over the past 6 years and the data, as we have shown, **we are confident that we do have what it takes for this drug to be favorably evaluated**."

55.     A few days later, on November 12, 2019, FibroGen filed its 3Q19 report on Form 10-Q with the SEC. Commenting on the safety analysis of Roxadustat, defendants Schoeneck and Cotroneo stated:

> The below **cardiovascular safety analysis reflects the pooling strategy and analytical approach we agreed on with the FDA**. Similar sets of analyses will be submitted to the EMA to serve as the basis for potential approval in dialysis and non-dialysis in Europe, and additional supportive analyses and sensitivity analyses as well as subgroup analyses will also be included in the NDA and MAA. However, the FDA and EMA will each conduct their own benefit-risk analysis and may use additional statistical analyses other than those agreed with the FDA or set forth below, including, but not limited to, prespecified or other analyses that may not sufficiently address the differential drop-out rate between the roxadustat and placebo study arms in non-dialysis.

56.    Defendant Schoneck and Cotroneo, discussing the non-inferiority margin and safety analysis of Roxadustat, continued:

> In our pre-NDA meeting, the FDA agreed that the ITT-analysis would be our primary cardiovascular safety analysis method for non-dialysis in the U.S. as it uses on-treatment and post-treatment long term follow-up (until a common study end date) to account for the higher drop-out rate in the placebo arm. ***The figure below shows that in the 4,270 pooled non-dialysis patients (OLYMPUS, ANDES, and ALPS), the risk of MACE, MACE+, and all-cause mortality in Roxadustat patients were comparable to that in placebo patients based on a reference non-inferiority margin of 1.3***.

57.    On February 25, 2020, defendant Conterno, FibroGen's CEO, presented at the SVB Leerink Global Healthcare Conference.    Commenting on the safety analysis of Roxadustat, he stated:  "And then, of course, there is this question of, well, how does the cardiovascular safety look like.  As you're aware, I've had a chance to conduct and be part of a number of cardiovascular studies in my previous role, and I believe that the ***data that we have on cardiovascular safety is very compelling***."  Continuing to discuss the safety analysis of Roxadustat, Conterno added:

> ***And when we look at the data, basically – we basically show to be comparable to placebo***.    And importantly, when we look at the subcomponents of MACE, we had, or course, MI and stroke, and death, and ... Hospitalization for heart failure and hospitalization for unstable angina. We – when we look at all those, in each – for each one of the subcomponents, that confidence interval actually encompassed one which makes ***our data extremely clean ... from my perspective when it comes to cardiovascular safety***.

Turning to whether Roxadustat requires a Black Box warning, Conterno stated:

> And then, I think if you look at the data on its face, ***I do not believe that the data warrants a black box***.  Now there's a lot of context when we discuss a black box, and of course, there's a black box for EPO agents in the class. I get that, and the FDA takes many considerations.  But I do think that it is a pretty high standard, and ***I'm very excited and delighted with the results that we got in – out of cardiovascular safety*** ....

- 19

58.    On March 2, 2020, FibroGen released its 4Q19 and FY2019 results.  During

an earnings call with shareholders and securities analysts, defendant Yu commented on the

efficacy of Roxadustat as well as on the safety analysis of the drug, stating:

> **With the robust efficacy and safety profile demonstrated** in our large
> Phase III program of over 8,000 patients, we believe roxadustat can
> potentially better address CKD anemia than what is currently available to
> CKD patients on dialysis and those not on dialysis.
>
> *        *        *
>
> Roxadustat-treated patients had **lower transfusion risk than epoetin
> alfa patients, while lowering MACE+ risk in the dialysis patient pool**.
> Notably, unlike ESA, Roxadustat maintain efficacy without increasing dose
> requirements in the presence of inflammation.
>
> *        *        *
>
> Within the dialysis patient population, we are particularly excited
> about the cardiovascular safety results of the incident dialysis population.
> These patients entered the study during the first 4 months of dialysis
> initiation and had an average treatment duration of 1.5 years.  We enrolled
> over 1,500 incident dialysis patients in this program, the largest in this
> population ever conducted.  Here, we **demonstrated a meaningful reduction
> in cardiovascular safety risk, as Roxadustat- treated incident dialysis
> patients had a 30% lower MACE risk and a 34% lower MACE+ than
> epoetin alfa-treated patients**.  We believe the high-risk incident dialysis
> population is the right and most appropriate setting for comparison of
> Roxadustat versus the epoetin alfa, since most patients are ESA- naïve to
> prior to study entry."
>
> *        *        *
>
> **With respect to cardiovascular safety, Roxadustat was comparable
> to placebo in risk of MACE and MACE+**, while achieved a mean
> hemoglobin level of 11 grams per deciliter.

59.    On May 7, 2020, defendants participated in an earning conference call for

shareholders and securities analysts regarding the Company's 1Q20 results.  During the call,

defendant Yu, commenting on safety analysis of Roxadustat, stated:

> Importantly, **we have demonstrated cardiovascular safety in the overall
> dialysis population and in MACE**.  And furthermore, we demonstrated a
> reduction in MACE+ risk.  In our 1,530- incident dialysis patient pool, where

the comparison between Roxadustat with epoetin alpha started within the first 4 months of dialysis initiation, ***Roxadustat had a 30% lower risk of MACE and 34% lower risk of MACE+ than epoetin alfa, with a trend towards lower or cause mortality, relative to epoetin alfa***.

Speaking to the efficacy and safety of Roxadustat, defendant Yu added:

> When we look at the converted patients or the stable dialysis patients and evaluate and ***looking at safety – cardiovascular safety, it does not change any of the conclusions that we have on the – about Roxadustat being safe and efficacious***.... And so, ***in conclusion, Roxadustat, excellent cardiovascular safety profile***, coupled with the statistically significant and clinically meaningful, higher hemoglobin efficacy results and ***lower transfusion rate relative to epoetin alfa***, together makes Roxadustat potentially a ***better treatment option for dialysis-dependent patients. We like the hand that we have and expect the product label to reflect the results of clinical trials on our compound***.

60.    One week later, on May 14, 2020, defendant Conterno spoke about Roxadustat at the Bank of America Securities Healthcare Conference. There, he stated:

> But in particular, ***as I think about the differentiation of Roxa, number one, I think you have to start with efficacy***. Keep in mind that not only do we meet our primary efficacy end points, we were basically statistically superior to EPO on our trials in DD. So that's important. Of course, we also show efficacy. It was relative to placebo in NDD. And quite – when we look at – one of the benefits of having it translates into lower transfusion rates. ***We actually had lower transfusions with Roxa than with EPO***, and of course, much lower relative to placebo in the NDD segment. ***So that benefit to me, I think, is pretty significant***. Clearly, in the – when we look at the totality of the data, ***I find our overall cardiovascular data pretty compelling. And in particular, I think we need to highlight the incident dialysis data, whereby we basically show a reduction in risk of MACE events at a time that is critical***. And this is – incident dialysis, basically, covers those patients within the first 4 months of starting dialysis. That is the time when a treatment decision is made when it comes to anemia. So I feel like we are perfectly accurate to wish – with a huge benefit in that cohort of patients, to be able to have a significant position longer term in that segment. So that I find also quite meaningful. And clearly the data is highly – it was – ***compared to EPO, it's highly differentiated based on what we can see***.

61.    Three weeks later, on June 2, 2020, defendant Conterno similarly misrepresented the safety analysis of Roxadustat and the need for a Black Box warning at the Jefferies 2020 Healthcare Conference. Specifically, he stated:

- 21 -

I think in NDD we basically have a comparison relative to placebo. And therefore when we look at our data, ***I feel it basically shows that the product is safe because of the safety profile when it comes to CV comparable to placebo*** .... In DD, yes, the question could be raised, well, you're comparing yourself to a product that has a black box in DD, and I get that. But in DD, ***when it comes to incident dialysis, we do show an actual significant benefit, well, with a 30% reduction in MACE. When I put those two reasons together, I look at the compelling nature of our data, and I feel that the data does not warrant a Black Box*** related to CV safety."

62.    On August 6, 2020, FibroGen executives participated in an earning conference call to discuss the Company's 2Q20 results. During the call, defendant Conterno, discussing whether Roxadustat requires a Black Box warning considering the efficacy and safety profile of the drug, stated:

As it relates to a boxed warning, as I mentioned, we're not planning to make comments when it comes to labeling going forward. But ***clearly, we view that Roxadustat will be successful – I think I've mentioned this to you and others in the past, very successful regardless***. Clearly, we need to look at the entire label. And when we look at the label for Roxadustat, including a potential boxed warning, it's going to be what does the lab[el] in totality says and our ability to fully commercialize Roxadustat, given all the benefit that it can provide. ***We continue to view that our data shows a very positive benefit- risk profile for the product***.

63.    On the same date, August 6, 2020, FibroGen filed its 2Q20 quarterly report on Form 10-Q. Therein, defendants Conterno and Cotroneo, discussing the safety analysis of Roxadustat, stated: "As mentioned above, during the second quarter of 2019, ***the Company received positive topline results from analyses of pooled MACE and MACE+ data from its Phase 3 trials for Roxadustat, enabling the Company's NDA submission to the FDA***."

64.    Three months later, on November 5, 2020, FibroGen hosted an earnings conference call for shareholders and analysts to discuss the Company's 3Q20 results. During the call, defendant Conterno also discussed the efficacy and safety analysis of Roxadustat, stating:

- 22

Together with our partners, we had 42 presentations, including 10 oral, which add to the understanding of roxadustat's efficacy and safety profile and the unmet need – and the unmet medical need in anemia of CKD. ***The roxadustat clinical data demonstrated consistent efficacy and reassuring safety results across the continuum of CKD patients with anemia***, adding to the established body of evidence highlighting roxadustat as a potential foundational treatment for this condition affecting millions of patients. We also presented data on the significant burden of anemia of CKD, a reminder that new treatment options for these patients are sorely needed.

Defendant Conterno, on Roxadustat's safety profile, continued:

Now when it comes to Roxa, I think what's important is when – first, when we look at the overall trial, we basically see that in ***NDD, we were comparable to placebo. So that's when it comes to MACE. So that's critically important. We showed non-inferiority***…. So we think that roxadustat offers a number of benefits. I think if we think about straight off the bat, in incident dialysis ***the excellent data that we have with – showing basically reduced cardiovascular outcomes in this population, so that's extremely important***.

65.     On December 9, 2020, FibroGen responded to a Citizen Petition filed with the

FDA regarding Roxadustat. In the response, FibroGen Senior Vice President Frost stated:

"***Cardiovascular safety of Roxadustat was also carefully evaluated, and demonstrated in the Phase 3 program***, by assessment of major adverse cardiovascular events (MACE) from pooled analyses of Phase 3 studies. In the MACE analysis of the DD-CKD patient pool, ***roxadustat demonstrated non-inferiority compared to epoetin-alfa, and in the NDD- CKD pool, Roxadustat demonstrated non-inferiority to placebo with respect to MACE***."

Continuing to address the safety analysis of Roxadustat, Frost added:

***FibroGen's NDA submission was complete, complied with all FDA guidance, and included data from all clinical and preclinical studies***. The Integrated Summary of Safety cardiovascular safety report includes the pooled cardiovascular safety analyses of the DD-CKD, and NDD-CKD patient populations. In addition, for completeness and full transparency, FibroGen included certain cardiovascular safety sensitivity analyses, including the stable dialysis subgroup, and the DD-CKD pool including the PYRENEES study. The results from these sensitivity analyses do not change the conclusions with respect to MACE of non-inferiority of roxadustat to epoetin-alfa in DD-CKD patients, and non-inferiority of roxadustat to

placebo in NDD- CKD patients.  In conclusion, FibroGen's NDA submission was complete and transparent.  The data supporting the safety and effectiveness of roxadustat is robust and compelling.

66.     Three months later, the FDA informed the Company that the FDA would hold an AdCom meeting to consider FibroGen's NDA for Roxadustat.  The FDA set the AdCom meeting after considering the Phase 3 Roxadustat clinical data submitted by the Company.

67.     To downplay the significance of the FDA's decision to hold an AdCom meeting, on March 2, 2021, defendant Conterno stated during the 41st Annual Cowen Healthcare Conference:

> *It is not unusual for the FDA to hold an Adcom for a first-in-class new molecular entity*.  And in fact, we shared last spring that we were preparing for – very much for that possibility.  So now I think for us, we are refocusing our efforts on resuming those activities.  I'm very much looking forward now to presenting the comprehensive roxadustat data in that public [setting].  We continue to have confidence in *the completeness of the NDA submission and the strength of the roxadustat data*.

Discussing Roxadustat's safety profile analyses, Conterno added:  "But at the end, I think we know that an Adcom is an opportunity to basically showcase, *I think, the strength of our data, and we continue to have confidence on the strength of the data of Roxadustat across both DD and NDD*."  "Honestly, I think we feel highly confident about both DD and NDD. We think that the data, I think, *supports – the benefit risk profile*."

68.     Just as shareholders were digesting this adverse news, on April 6, 2021, defendants stunned them again by disclosing that the primary cardiovascular safety analyses for Roxadustat included *post-hoc* changes to the stratification factors.  In other words, the previously publicly safety analyses of Roxadustat present a more favorable than factual assessment.  To try to allay shareholders' fears, defendant Conterno stated:  "It is important to emphasize *that this does not impact our conclusion regarding the comparability, with respect to cardiovascular safety, of Roxadustat to [Epogen] in dialysis-dependent(DD)*

*patients and to placebo in non-dialysis dependent (NDD) patients*…. We continue to have confidence in Roxadustat's benefit risk profile."

69.    In a "Business Update" call on the same date, April 6, 2021, defendant Conterno, discussing the safety analyses of Roxadustat and the recently revealed *post-hoc* changes to the stratification factors, stated: "***Our conclusion regarding the comparability with respect to cardiovascular safety of Roxadustat to epoetin-alfa in dialysis-dependent patients and to placebo in nondialysis-dependent patients is not impacted. So let me be very clear. We continue to have confidence in Roxadustat's benefit risk profile, and we're committed to working closely with the FDA to bring this important new treatment to patients living with anemia of CKD***." Defendant Eisner, FibroGen's Chief Medical Officer, added: "Importantly, these analyses do not change the Company's assessment that ***Roxadustat is comparable to placebo in nondialysis-dependent patients and to epoetin-alfa in dialysis-dependent patients using MACE to measure cardiovascular safety***," and that "the incident dialysis point estimates are still below 1. And the ***overall analysis are consistent with comparable safety to placebo in the NDD population and to ESA in the dialysis-dependent population. And overall, we feel very good about the overall benefit-risk profile of the drug***."

70.    On May 10, 2021, FibroGen hosted a conference call for shareholders and analysts about its 1Q21 results and recent developments around Roxadustat's Phase 3 clinical trial. To alleviate concerns, defendant Conterno, discussing the safety analysis of Roxadustat, stated: "Importantly, ***this clarification does not impact our overall conclusions regarding the comparability with respect to cardiovascular safety of Roxadustat to epoetin alfa in dialysis-dependent patients and to placebo in non-dialysis dependent patients***. As described on April 6, for the incident dialysis subgroup, based on the prespecified

stratification factors, roxadustat is comparable but not superior to epoetin alfa with regards to cardiovascular safety."  Feigning confident in Roxadustat's prospects for FDA approval, now considering recent *post-hoc* data manipulations, defendant Conterno added:  "***I want to reiterate that we continue to have confidence in the Roxadustat data and in the safety and efficacy profile demonstrated in the Phase 3 program***."

71.     A few weeks later, on June 4, 2021, defendant Conterno echoed his confidence in Roxadustat's approval at the Jefferies Healthcare conference, stating:  "***Keep in mind, I think what – and I think it's important that I highlight that Roxadustat has shown comparability when it comes to both placebo in NDD and relative to EPO in DD***…. And while we are – when we look at the hazard ratio of – in incident dialysis, well, it is not below – while the upper bound is not below 1, the hazard ratio, ***the estimate is still below 1, and it looks very, very positive***."

72.     On July 15, 2021, the FDA's AdCom met and reviewed Roxadustat's NDA. Following the meeting, the AdCom concluded that FibroGen's internal data analyses showed that Roxadustat's efficacy over Epogen was inconclusive, and that Roxadustat's caused greater rates of certain adverse event than Epogen, including a higher rate of death and other major side effects.  In the end, the AdCom voted unanimously against approval of Roxadustat.

73.     On this news, the trading price of FibroGen's common stock collapsed by $10.49 per share, or 42%, to $14.35 per share on July 16, 2021, ending defendants' unlawful stock pump and dumb scheme.

**Defendants' Statements Were Knowingly
False When Made and Made With Scienter**

74.    Defendants' positive statements about the safety and efficacy data of
Roxadustat, and that the safety data was derived from FDA-sanctioned analysis, were false.
With knowledge of the truth, defendants misrepresented and omitted material facts and
breached their fiduciary duty of loyalty and care and legal disclosure obligations to FibroGen
and its shareholders.  In fact, Roxadustat's Phase 3 trial results showed that the drug was
neither superior to Epogen, the standard of care to treat anemia in chronic kidney disease
patients, nor safer than the placebo, that made FDA approval of Roxadustat unlikely.  To the
opposite, once defendants revealed "the post-hoc changes to the stratification factors" in
Roxadustat's Phase 3 trial results, the true data showed that there were substantial safety
concerns – including increased risks of serious complications, including thrombosis,
seizures, stroke, and even death – that rendered Roxadustat significantly less effective and
less safe than placebo or even Epogen.  When these truths reach the market, the trading price
of FibroGen common stock collapsed by $10.49 per share, or 42%, to $14.35 per share on
July 16, 2021.

75.    Thereafter, FibroGen shareholders sued defendants, as well as the Company
based on the defendants' alleged misrepresentations and omissions, for securities fraud in a
nationwide class action lawsuit filed in San Francisco, California.  The shareholders'
complaint alleged that the defendants misrepresentation pertained to: (i) the efficacy and
safety of Roxadustat; (ii) whether Roxadustat would receive a "Black Box," the FDA's most
severe safety warning if approved; (iii) the non-infringement margin FibroGen used in its
safety analysis; and (iv) validity of defendants' expressions of optimism around Roxadustat's
potential and likelihood of FDA approval.

76.     Several months after the filing of the securities fraud complaint, the defendants, along with FibroGen, filed a motion to dismiss the securities fraud claims under the PSLRA.  The PSLRA imposed heightened pleading standards around both falsity and state of mind, *i.e*., scienter, for a securities fraud claim to survive.  Observers say the PSLRA can require a plaintiff to plead more detailed evidence at the pleadings stage than may be necessary to prevail on the merits at trial.  The PSLRA is an imposing hurdle for a securities fraud lawsuit to overcome, and only the most meritorious claims survive.

77.     In the motion to dismiss, the defendants challenged the adequacy of both the complaint's falsity and scienter allegations without success.

### Defendants' False Statements About Roxadustat and Its Potential Are Not Forward-Looking Statements or Otherwise Protected Against Liability Under the Federal Safe-Harbor for False Forward-Looking Statements

78.     As to falsity, the defendants first argued that their positive statements about the efficacy and safety of Roxadustat, what label the FDA might require for Roxadustat if approved, and Roxadustat's potential for approval are forward-looking statements and therefore protected against liability under the PSLRA's safe harbor for forward-looking statements.  This argument did not challenge the actual falsity of the statement, but rather argued its non-actionability on the grounds that such statements did not rest on existing facts.  The District Court rejected the defendants' argument, however, and found that there "are elements within [the statements] that are not-forward-looking," but rather "based on existing and alleged manipulated data."  For example, as to defendant Yu's December 20, 2019 statement, "[w]e are excited to have achieved superiority in efficacy not only against placebo but also over epoetin alpha in our studies ...." the District Court held that "[t]he 'potential' of Roxadustat is based on the assertions that existing clinical studies achieved superiority in

efficacy against both placebo and epoetin, which are not forward looking." The District Court further held that "[s]tatements that FibroGen had a 'very good pre-NDA meeting with the FDA on [R]oxadustat[,]' that the FDA reached an agreement 'on our proposed pooled MAC analysis[,]' and that FibroGen was 'very pleased with the agreement [with the FDA] on the primary safety analysis of our primary cardiovascular safety endpoint in the NDD' are not merely expressions of optimism that would qualify for safe harbor protection," because "[t]hey are based on past interactions with the FDA" and not forward looking. Further still, the District Court rejected the defendants' arguments that their statements about favorable labeling for Roxadustat and the drug's potential approval by the FDA were forward-looking, because such statements "highlight the existing clinical trial analyses," and "cannot be meaningfully separated from the allegedly manipulated clinical analyses and past interactions with the FDA." In other words, the challenged statements "mix past or current facts with forward-looking optimistic statements [and therefore] do not qualify for safe-harbor protection." Rejecting the defendants' argument that the PSLRA forward-looking statement safe harbor applies, because the complaint failed to allege that defendants had actual knowledge that any statement was false or misleading when made, the statements are not actionable, the District Court held "this argument is unconvincing because the allegations that the Defendants manipulated the clinical data to obtain more favorable analyses implies knowledge."

### Defendants' Positive Statements About Roxadustat and Its Potential Are Not Merely Corporate Puffery or Optimism but Rather Actionable False Statements Anchored in Misrepresentations of Existing Facts

79.     Defendants also argued that their positive statements about Roxadustat's efficacy, safety, and approvability are statements of mere corporate puffery and optimism, and therefore, not actionable under the federal securities laws. But if the statements are not

puffery or vague expressions of optimism, defendants argued the statements still are not false

because the complaint does not allege that the Roxadustat Phase 3 clinical data was falsified

and/or that any defendants did not believe that there were reasonable interpretations of the

data.  The District Court rejected these arguments, however.

      80.     Instead, the District Court held that "statements about the safety and efficacy

of Roxadustat and the potential for NDA approval are not mere puffery or opinions and,

therefore, [are] actionable….  Defendants' expressions of confidence are in the context of

discussion the safety analyses of the existing data," the District Court explained.  The

District Court continued:  "For example, after describing the efficiency and safety as

'robust,' [defendant] Yu described that Roxadustat-treated patients had lower transfusion

risks than epoetin and lowered MACE+ risk in the dialysis patient pool."  The District Court

continued:

> Similarly, the descriptions "positive," "good," "favorable," and "right" for
> the safety profiles were later followed with "comparable to placebo," "we
> showed non-inferiority" and that the drug "basically reduced cardiovascular
> outcomes in [the incident dialysis] population."  The [Complaint] is replete
> with such objective statements, "such as claim that Roxadustat 'reduced risk
> of MACE by 30%' in the crucial incident dialysis population; and that the
> analyses were "agreed [upon] with the FDA."

Additionally, rejecting defendants' argument that "mere disagreements with the type of

analysis used and the interpretation of a clinical trial result cannot be false and misleading,"

the District Court held, "what Plaintiffs allege goes beyond merely using different statistical

analyses and difference in interpreting the results of the clinical trial; the crux of the

complaint is that Defendants actively *manipulated* the data post hac."

**Defendants' Statements About Roxadustat and Its Potential**
**Were Directly Contradicted by What They Knew at the Time**

81.    After failing to discredit the shareholder plaintiffs' allegations that defendants misrepresented and omitted material facts about Roxadustat on the grounds that such statements are non-actionable forward-looking statements and/or mere corporate puffery, defendants next argued "that the [complaint] fails to plead falsity because it simply does not allege that any data was falsified or that any individual defendant did not sincerely believe that they were reasonable interpretations of the data."  The District Court overruled this argument, however, by, first, observing that "the [complaint] alleges that Defendants had 'manipulated' Roxadustat's clinical trial data, and such post-hoc analyses were 'improper' and considered little more than 'after-the-fact "data-dredging"' (misuse of data analysis)," and, second, finding that "[t]he allegations of manipulation imply that the data was falsified and the Defendants knew so."

82.    Next, defendants contended that it was not misleading to publicly share the Company's interpretation of the Roxadustat clinical data based on only certain safety analyses, because there is no duty to disclose all material information.  "This argument also fails," the District Court concluded, "because Plaintiffs' allegation is not that Defendants simply omitted some information but that analyses were manipulated to show a reduction in MACE risks when there was no evidence of it."

83.    Continuing and rejecting defendants' argument that for falsity to exist the allegation "must specifically challenge either the accuracy of the numbers contained in the analyses or the conclusions drawn from them," the District Court held that "Plaintiffs sufficiently challenge with specificity the facts and conclusions drawn from the clinical trial data by Defendants," pointing out "'contrary to Defendants' statements ... highlighting the

- 31 -

purported statistically significant 30% and 34% reduction in MACE and MACE+ risk in the crucial incident dialysis population – under Roxadustat's true, undisclosed prespecified analyses, there was no evidence of any purported reduction of MACE risk in this population at all.'"

84.    As to the shareholder plaintiffs' allegations that the defendants misrepresented that an agreement existed with the FDA around the analytical framework for the pooled safety analysis until the pre-NDA meeting in July 2019, the defendants argued that such statements could not have been false.  Unconvinced, the District Court found that the argument is a "moot point," because, contrary to defendants' argument, the shareholders plaintiffs do not allege that defendants claimed that the framework for their analysis was approved by the FDA before July 2019.  But rather, the plaintiff alleged that the post-hac changes to the Roxadustat test data itself were misleading, because the post-hac changes were material, undisclosed facts to both the FDA and shareholders, and thus support an inference of falsity.

85.    Defendants also disputed the impact of the post-hoc changes disclosed on April 6, 2021, arguing that such "statements were not false because FibroGen reiterated in the April 2021 release the same conclusions regarding comparative MACE risk in the NDD and DD trials."  But this falsity argument also failed.  Instead, the District Court concluded that "Plaintiffs have plausibly alleged that the post-hac manipulations were material," because, among other things, "the AdCom allegedly 'overwhelmingly' voted against the drug," and "[a]though Defendants selectively quote the portion [of the AdCom record] that there was 'no significant difference in the risk of MACE' for the NDD population, Dr. Unger subsequently stated that there was an increased risk of MACE in other studies," stating "'the

results from the on-treatment or the OT-plus-7 analysis suggest an increased risk of MACE for the roxadustat arm compared to placebo.'"

86.    Defendants Yu and Conterno also specifically contested the falsity of their statements about the non-inferiority margin for the pooled safety analyses of Roxadustat, but with only limited success.  The shareholder plaintiffs alleged that defendants Yu and Conterno "'falsely stated that Roxadustat had achieved noninferiority because its hazard ratio was below th[e] 1.3 threshold which the FDA would supposedly be looking for in reviewing Roxadustat's MACE results,'" but this was materially misleading "because the FDA had already expressly rejected 1.3 non-inferiority margin for the reason that 'it was defined [by FibroGen] after the results of the study were known' – *i.e.*, post-hoc…. [T]he FDA had told FibroGen that it 'had a goal of 1.25' during the pre-NDA meetings ...."  While the District Court concluded that the falsity allegations were not plausible "to the extent that Defendants falsely implied to investors that the FDA had agreed to a non-inferiority margin of 1.3," the allegations "are plausible to the extent that the [complaint] alleges that data was manipulated to show a lower margin."  Explaining the reasons for its conclusion, the District Court wrote:

> Defendants argue that it makes no sense that FibroGen would have lied about the 1.25 non-inferiority margin because all pooled safety results presented using the 'post-hoc' stratification factors were below 1.25 anyways.... This argument fails; while the post-hoc manipulated analysis did not reach 1.25, ... the prespecified sensitivity analyses (that FibroGen never disclosed to investors and were disclosed by the FDA for the first time during the AdCom) exceed both the 1.25 and 1.3 margins....  As such, there was sufficient reason for FibroGen to lie about the 1.25 figure.  As such, the [complaint] survives to the extent that Defendants represented that the hazard ratios fell below 1.3 when, in fact, allegedly exceeded 1.3.

### Defendants Acted with Scienter – *i.e.*, Knowledge of the Falsity of the Positive Statements About Roxadustat and Its Potential

87.    Defendants also challenged the sufficiency of the scienter allegations lodged against them in the shareholder plaintiffs' action for federal securities fraud.  For federal

securities fraud liability to attach a defendants must have acted with scienter, defined as "'a mental state embracing intent to deceived, manipulate, or defraud.'"  Overruling the defendants' contrary arguments, the District Court concluded the defendants acted with scienter when making false and misleading statements to shareholders about the efficacy and safety of Roxadustat, what label the FDA might require for Roxadustat if approved, and Roxadustat's potential for approval.

88.    Defendants argued that the shareholder plaintiffs' theory of scienter was implausible given the post hoc changes that reflected the defendants' cooperation with the FDA.  And further that the plaintiffs' scienter allegation "are unavailing" because "it makes no sense that a company would conspire to artificially inflate the Company's stock price even though they knew the truth would eventually come out during the FDA's review of the Roxadustat NDA and face and inevitable fall out."  However, the District Court disagreed and rejected the defendants' argument that they did not act with scienter.  Instead, the Court held that, unlike in other decision, the shareholder plaintiffs'

> allegations do not simply amount to honest and 'favorable [analysis] ... on the risk-benefit issue ... backed up by a large body of details from [the company's] research....  Here, Defendants allegedly manipulated data in order to conceal known safety issues, like *Arena*'s silence regarding their dispute with the FDA....  Plaintiffs' theory is that Defendants believed they would have obtained FDA approval through manipulation....  The dubiousness of post-hoc changes supports an inference of scienter.

89.    The District Court also concluded that "[s]cienter is also supported by the reaction of the scientific and financial community to the disclosure of Defendants' manipulation of data [regarding Roxadustat]."  Although the court acknowledged that "[d]efendants are correct that the alleged contents of the articles are conclusory" and, therefore, insufficient standing alone.  The Court nevertheless found that "while th[e] articles and reports do not establish scienter by themselves, they lend some support to the extent that

analysts and experts, including a nephrologist who was involved in the Roxadustat clinical

trials, were quoted for their opinions." Citing one example, the District Court wrote: "For

example, Dr. Daniel Coyne is alleged to be a professor and a nephrologist who worked as a

site investigator of the Roxadustat clinical trials and is quoted in an article: 'This deeply

damages the reputation of FibroGen .... I feel very misled, and I don't think there is any

excuse for this. I don't know how this could happen accidentally.'"

90.    Defendants further argued that "the fact that Roxadustat [had] received

regulatory approval in the second to eighth biggest pharmaceutical markets in the world

between 2018 and 2020 shows a lack of scienter." But the Court made quick work of this

argument, holding that:

> This is a helpful fact for Defendants but does not undermine the plausibility
> of Plaintiff's allegations. Different countries have different requirements and
> criteria for the approval of a drug; therefore, approval in other countries do
> not guarantee approval in the United States.... As such, Roxadustat's
> favorable stance in other countries, while relevant, does not itself negate
> Defendants' scienter regarding Roxadustat's potential in the U.S.

91.    Additionally, the defendants disputed that the April 6, 2021 press release was

an admission of manipulation of Roxadustat's clinical trial results and, therefore, does not

show that defendants acted with scienter. The District Court rejected this argument and

concluded that "Plaintiffs have sufficiently alleged scienter because: (1) the press release

admitted that Defendants made 'post-hoc changes to the stratification factors,' and

(2) Defendants allegedly falsely touted this manipulated data for over two years."

92.    Defendants contested they acted with scienter base on the shareholder

plaintiffs' allegations about defendants' compensation, and particularly defendant Yu and

Cotroneo's 2019 compensation largely consisting of stock and option awards, but without

meaningful success. As to an inference of scienter arising from the defendants'

"compensation tied to regulatory and commercial milestones" associated with Roxadustat, the District Court concluded that, "[w]hile there is no comparisons of compensation [in] the years prior to the Class Period, the figures alleged by Plaintiffs[, including over $5 million paid to Yu and $4.3 million paid to Cotroneo in 2019,] lend some support to Plaintiffs' allegations of scienter." The District Court continued:

> Here, Plaintiffs have alleged that FibroGen's Proxy expressly ties some individual defendants' large compensation to the NDA submission relying on manipulated data. Furthermore, these options and stock awards far outweigh their salary. Both Conterno and Yu's salaries were merely a tenth of their other forms of compensation, most of which was stock and option awards.... Accordingly, Defendants' compensation structure suggest some degree of scienter.

93.    Further, as to defendant Yu's "abrupt" resignation on November 27, 2020, the District Court rejected the argument that the resignation did not show that Yu acted with scienter. Specifically, the Court held: "While Yu is correct that a resignation by itself is insufficient indication of scienter, her abrupt resignation tends to support scienter and may be considered together with other allegations, including statements by confidential witnesses and the compensation she received, because scienter is reviewed holistically."

### Defendants Breached Their Fiduciary Duties of Truthful Disclosure and Avoiding Self-Dealing by Misrepresenting and Omitting Material Facts About Roxadustat and Its Prospects

94.    As detailed above, defendants misrepresented and omitted material facts about the efficacy and safety analyses of Roxadustat, the potential approval of the NDA for Roxadustat, what label the FDA may require for Roxadustat if approved, and Roxadustat's potential were false when made, and known false by defendants at that time. Their misrepresentations and material omissions advanced their self-dealing and unlawful scheme designed to artificially inflate the trading price of FibroGen common stock, allowing them to profit by selling their personal FibroGen shares for over $9 million, as well as to extract

extra compensation through fake performance milestones tied to the development of Roxadustat. As a result, defendants breached their fiduciary duties proscribing self-dealing and false disclosures about the corporation's business and affairs.

95.     Delaware law affords considerable leeway to the directors and officers of a Delaware corporation in connection with the management and oversight of the corporation's business and affairs. Guardrails do exist, however. And, although few, they are strict. Whenever the directors and officers of a Delaware corporation chose to speak on behalf of the corporation, and/or about the corporation's business and affairs, in shareholder communications and elsewhere, the directors and officers shall only speak the entire truth. A failure to do so will breach his/her fiduciary duty of disclosure, and such disloyalty can make directors and officers liable to the corporation for the resulting damages. Likewise, the fiduciary duty of loyalty owed to the corporation by its directors and officers strictly forbids self-dealing by such corporate fiduciaries. To this end, the directors and officers of a Delaware corporation shall not trade on adverse, material non-public corporation information to secure financial benefits for themselves by trading the shares of the corporation's publicly traded securities. Nor shall the directors and officers of a Delaware corporation manipulate corporate assets and information to report fake progress and results to secure extra compensation for themselves. Such self-dealing is deceitful and dishonest and, when present, constitutes a breach of loyalty for which the offending directors and officers may be held liable to the corporation.

96.     Here, defendants' misconduct breached their fiduciary duties. They engaged in an unlawful scheme designed to enrich themselves by misrepresenting and omitting material facts about Roxadustat and its potential. Defendants' lies about the efficacy and safety analyses of Roxadustat, the potential approval of the NDA for Roxadustat, what label

the FDA may require for Roxadustat if approved, and Roxadustat's potential were contrary to their fiduciary duty to speak only the truth whenever they communicated with FibroGen shareholders about the Company and its business and prospects. By presenting fake data, that omitted material facts around Roxadustat's efficacy and safety analyses, and that the drug was not superior to placebo nor safer than even Epogen, defendants breached their duty of full disclosure owed to FibroGen and its shareholders. Further, the scheme enabled defendants to self-deal and personally profit through stock sales and executive compensation and breached their fiduciary of loyalty.

97.    Although FibroGen is a legal person, it can only act through its directors and officers. Here, the defendants damaged FibroGen by engaging in the unlawful activities detailed above. By breaching their fiduciary duties of loyalty and care, to refrain from self-dealing and false disclosures, the defendants have caused FibroGen to suffer damages, injuries and losses. A director or officer of a Delaware corporation may be held liable to the corporation for injuries the former's misconduct proximately caused the latter. As a result, the defendants are liable to FibroGen for damages it has sustained, and will sustain, due to the defendants unlawful scheme designed to enrich themselves, by misrepresenting and omitting material facts about Roxadustat and its potential.

**DAMAGE AND INJURY TO FIBROGEN**

98.    As alleged above, the statements and events described herein gave rise to the Securities Action being initiated against the Company. The Securities Action was sustained on July 15, 2022, and the court's order in this regard presages continued damage and injury to FibroGen's assets, goodwill, and reputation.

99.    FibroGen has suffered additional damages as well. For instance, FibroGen is suffering and will continue to suffer from what is known as the "liar's discount," a term

applied to the stocks of companies which have been implicated in improper behavior and have misled the investing public, such that FibroGen's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as the Securities Action continues to unfold, FibroGen will be further damaged by the professional fees, costs, and expenses incurred in connection with that matter, not to mention the decline in productivity associated with the distractions that come with exposure to such litigation.

100. Defendants have not fared nearly so badly. In addition to the $9 million in proceeds they reaped from their illicit insider trades; defendants have collectively pocketed at least $56 million in compensation not justified by the Company's performance while under their stewardship. Nonetheless, the Board has not – and will not – protect the Company's interests by bringing legal action against the directors and officers responsible for this debacle.

## THE BOARD'S DISDAIN FOR PLAINTIFF'S LITIGATION DEMAND

101. Plaintiff incorporate ¶¶1-100.

102. On July 29, 2022 plaintiff St. Louis made a formal written Demand on FibroGen's Board to sue defendants for damages. Plaintiff demanded that the Board forthwith file a complaint against defendants for breach of fiduciary duty to preserve and protect the Company's valuable claims. Plaintiff also demanded that the Board immediately seek contribution against defendants to protect FibroGen against incurred losses and risks of loss arising from defendants' misconduct including false statements to FibroGen shareholders. Although not required, plaintiff also provided proof of its FibroGen stock ownership. *See* Exhibit A. But rather than act, the Board ignored the Demand. *See* Exhibit B.

103.    As a result, for over six months, plaintiff's calls on the Board to seek redress for FibroGen remain unanswered.  Damages claims including for breach of fiduciary duty are corporate assets.  Like all corporate assets, a board of directors is duty bound to protect and preserve the value of such claims.  A board may not sit on its hands and allow claims to diminish in value, or even become more difficult to monetize by, for example, the passage of time.

104.    Once a demand is made, after an investigation, a board of directors must determine, in its business judgment, if the demanded action is in the best interest of the corporation.  Absent engagement with a demand, a board will be unable to show that the directors informed themselves of the demand and carefully weighed its merits.  In this situation, a board's action is not entitled to judicial deference under the business judgment rule, because it does not demonstrate a considered business decision made with due care and in good faith.

105.    The effect of a shareholder demand is to put control of the derivative litigation in the hands of a board of directors.  The demand needs only to identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief.  *See* Exhibit A.  Where a demand meets these basic requirements, it is incumbent upon a board of directors to respond to the demand without delay.  In the face of a litigation demand, a board cannot stand neutral but rather must affirmatively object to or support the litigation.

106.    Although it is essential that a board of directors' process be meaningful, so that it inspires confidence, the process cannot drag on forever, or, worse, be deferred indefinitely and halted before it starts.  Where a board takes no action and simply fails to address a demand, a shareholder may proceed with its lawsuit.  And, in such situations,

courts may conclude that shareholders need wait no longer. In this context, a board's action does not demonstrate an informed and considered decision made with due care and is not entitled to judicial deference.

107.    Simply put, a board of directors cannot, consistent with its fiduciary duty, brush-off a demand or indefinitely defer it. Both strategies are effectively the same: a rejection of the demand. Here, contrary to its duty, FibroGen's Board wrongfully rejected plaintiff's Demand. Rather than timely act on the Demand, the Board left the Demand in limbo, with no progress, for several months.

108.    The Demand is sufficient on its face; it identifies the alleged wrongdoers, describes the factual basis for the wrongful acts and harm cause to the Company, and requests immediate remedial relief. As a result, it is incumbent on FibroGen's Board to accept or reject the Demand, it cannot stand neutral in the face of plaintiff's Demand. Yet, the Board has not done so, for over six months.

109.    Despite ample opportunity and time, the Board has not ordered FibroGen to sue defendants. Nor has the Board directed FibroGen to assert crossclaims against defendants for contribution or any other relief in the Securities Action. But for defendants' scheme, FibroGen would not be a named defendant in the Securities Action. That scheme rewarded defendants with millions in insider trading proceeds and performance-based compensation tied to the development of Roxadustat. By contrast, FibroGen has been injured, and despite plaintiff's Demand, the Board has sought no redress for FibroGen against defendants. As a result, due to its disdain for the Demand, the Board abdicated its fiduciary duty such that plaintiff may proceed derivatively on behalf of FibroGen against defendants in this lawsuit.

110.    The Board's attempt to defer action on the Demand fares no better, as this strategy is effectively a rejection of the Demand as well.  Moreover, the deferral is another form of neutrality that warrants no deference under the business judgment rule.  The Board's decision to defer investigation or consideration of the Demand was not done in an informed manner and with due care, as readily reflected in counsel's letter, dated November 11, 2022, informing plaintiff of the deferral.  Among other things, the short one-page letter on its face does not demonstrate that the Board weighed any potential recovery from the derivative action or considered the merits of breach of fiduciary duty or other claims.

111.    Nor can the Board fall back on the pendency of the Securities Action to justify brushing off the Demand.  If mere existence of a pending class action lawsuit was enough to outweigh all other factors, then a corporation's rights of action against wayward officers would be seriously compromised.  The resulting moral hazard would harm FibroGen by weakening the fiduciary duties – the highest known to the law – owed by corporate officers to preserve and protect the value of corporate assets.

112.    Accordingly, the Board did not acted reasonably and in good faith in connection with the Demand.  Whether framed as brushing aside or deferring the Demand, the Board conduct it is ineligible for business judgment safe harbor protection.  As a result, plaintiff may proceed derivatively on behalf of FibroGen against defendants in this lawsuit.

## COUNT I

### Breach of Fiduciary Duty
### (Against All Defendants for Disseminating False and Misleading Information)

113.    Plaintiff incorporates ¶¶1-100.

114.    Each of the defendants had a duty to ensure that FibroGen disseminated accurate, truthful, and complete information to its shareholders.

- 42

115.     Defendants did not act in good faith or exercise prudent business judgment by causing or allowing the Company to disseminate to FibroGen shareholders materially misleading and inaccurate information through, among other things, SEC filings and other public statements and disclosures as detailed herein.   More particularly, defendants knowingly or recklessly misrepresented and/or omitted material facts about Roxadustat including its approvability, efficacy and safety.

116.     Defendants' acts and omissions breached their fiduciary duties of care and loyalty and damaged the Company.   FibroGen is therefore entitled to relief against defendants and each of them.

### COUNT II

**Breach of Fiduciary Duty**
**(Against All Defendants for Insider Trading)**

117.     Plaintiff incorporates ¶¶1-100.

118.     Each of the defendants had a duty to avoid self-dealing in FibroGen's confidential non-public material information.   Defendants also had a duty to disclose all adverse material, non-public facts before trading FibroGen securities including its common stock.

119.     Defendants breached these fiduciary duties by selling personal shares of FibroGen common stock while in possession, and without first disclosing, adverse material, non-public information including about the true safety and efficacy of Roxadustat.

120.     Defendants' acts and omissions breached their fiduciary duties of care and loyalty and damaged the Company.   FibroGen is therefore entitled to relief against defendants and each of them.

## COUNT III

### Unjust Enrichment
### (Against All Defendants)

121.    Plaintiff incorporates ¶¶1-100.

122.    Defendants were unjustly enriched at the expense and to the detriment of FibroGen by their wrongful acts and omissions.

123.    Plaintiff, as a shareholder and representative of FibroGen, seeks restitution from defendants, the imposition of a constructive trust over defendants' proceeds from their misconduct, and/or an order requiring defendants to disgorge all profits, benefits, and other compensation obtained through, or because of, their wrongful conduct and fiduciary breaches.

## COUNT IV

### Corporate Waste
### (Against All Defendants)

124.    Plaintiff incorporates ¶¶1-100.

125.    Defendants, and each of them, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of FibroGen's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.  It resulted in continuous, connected, and ongoing harm to the Company.

126.    Defendants, and each of them, wasted corporate assets by: (a) paying excessive compensation and bonuses to certain of its executive officers; and (b) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants'

unlawful actions, including defending the Company and its officers against the Securities Action.

127.    As a result of the waste of corporate assets, defendants are liable to the Company.

128.    As a direct and proximate result of defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

129.    Plaintiff on behalf of FibroGen, has no adequate remedy at law.

## COUNT V

### For Contribution for Violations of §§10(b) and 21D of the Exchange Act
### (Against All Defendants)

130.    Plaintiff incorporates ¶¶1-100.

131.    Plaintiff brings this claim derivatively on behalf of FibroGen for contribution defendants, each of whom is a named defendant in the Securities Action.

132.    FibroGen is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violations of §10(b) of the Exchange Act.  If FibroGen is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the knowing or reckless unlawful acts or omissions of defendants, as alleged herein.  FibroGen is entitled to receive contribution from defendants in connection with the Securities Action against the Company.

133.    Defendants, as officers, had the power and/or ability to, and did, directly or indirectly, control or influence FibroGen's general affairs, including the content of public statements about FibroGen, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and Rule 10b-5.  Further, defendants are liable under §21D of the Exchange

Act, 15 U.S.C. §78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.  Accordingly, FibroGen is entitled to all appropriate contribution from defendants for exposing the Company to federal securities liability.

## COUNT VI

### For Contribution Under Delaware Law
### (Against All Defendants)

134.    Plaintiff incorporates ¶¶1-100.

135.    Plaintiff brings this claim derivatively on behalf of FibroGen for contribution defendants, each of whom is a named defendant in the Securities Action.

136.    FibroGen is named as a defendant in the Securities Action.  If FibroGen is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the knowing or reckless unlawful acts or omissions of some or all of defendants as alleged herein.

137.    Accordingly, FibroGen is entitled to all appropriate contribution from defendants, who are responsible for exposing FibroGen to liability under Delaware contribution law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all defendants for the damages sustained by FibroGen because of defendants' wrongdoing as alleged herein;

B.    Awarding FibroGen restitution from defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

C.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 30, 2023                    FARNAN LLP

                                         /s/ Michael J. Farnan
                                         Brian E. Farnan (Bar No. 4089)
                                         Michael J. Farnan (Bar No. 5165)
                                         919 N. Market Street, 12th Floor
                                         Wilmington, DE  19801
                                         Telephone:  302/777-0300

                                         Of Counsel:
                                         ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                         TRAVIS E. DOWNS III
                                         BENNY C. GOODMAN III
                                         ERIK W. LUEDEKE
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Attorneys for Plaintiff